## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

In re Target Corp. Securities Class Action
Litigation

No. 2:25-cv-00135-JLB-KCD

### RESPONSE OF STATE BOARD OF ADMINISTRATION OF FLORIDA TO MOTION FOR APPOINTMENT AS LEAD PLAINTIFF OF STATE TEACHERS RETIREMENT SYSTEM OF OHIO

The State Board of Administration of Florida ("SBA") respectfully submits this memorandum opposing the competing motion for appointment as lead plaintiff and approval of lead counsel filed by the State Teachers Retirement System of Ohio ("OSTRS"). *See* ECF No. 57.[1] SBA continues to seek appointment as lead plaintiff and that Boyden Gray PLLC, the Attorney General of Florida, Lawson Huck Gonzalez, PLLC, and America First Legal Foundation be approved as counsel. *See* ECF No. 56.

### INTRODUCTION

This case is about Target's decision to prioritize woke "stakeholders" who demand increasingly aggressive Environmental, Social, and Governance ("ESG") and Diversity, Equity, and Inclusion ("DEI") campaigns over investors who just want a positive return. It alleges that Target violated federal securities law when it assured investors it was keeping its ESG and DEI risks under control while simultaneously planning its most in-your-face initiative ever—the disastrous 2023 Pride Campaign featuring, among other items, tuck-friendly swimwear and chest-flattening articles.

---

[1] Unless otherwise specified, "ECF No." refers to the docket in *In re Target Corp. Securities Class Action Litigation*, No. 2:25-cv-000135 (M.D. Fla.).

OSTRS cannot adequately represent a class asserting such claims. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa). As Ohio's Attorney General recently admitted, OSTRS initially "declined to join the lawsuit" because its losses were "too small and not worth pursuing" and its board members "either agree with Target's stated DEI, ESG and LGBTQ+ initiatives and/or do not believe that such initiatives should be actionable."[2] This "unwillingness" to participate reflected their "position toward the underlying facts supporting the lawsuit."[3] OSTRS is evidently here not because it believes in the claims or the alleged significance of its losses, but because of the Attorney General's clout.[4] The PSLRA demands more.

Raising further questions about its commitment to vigorous representation, OSTRS has selected counsel—Grant & Eisenhofer ("G&E")—that is an avowed *supporter* of ESG and DEI priorities like the ones this lawsuit alleges harmed Target investors. G&E advertises that it has "been at the forefront of ESG-driven litigation for years,"[5] where it pushes investors and businesses to prioritize ESG goals, even at the expense of financial returns. G&E even founded an ESG Institute "to work with investors to further a wide array of ESG goals" because the firm has an "unwavering

---

[2] Letter from Dave Yost, Ohio Att'y Gen., to the Members of the Retirement Board of the State Teachers Retirement System of Ohio (Mar. 14, 2025), https://perma.cc/C4MF-LEZ5.

[3] *Id.*

[4] *See, e.g.*, Laura A. Bischoff, *Ohio Teachers' Pension Fund to Join Lawsuit Against Target Over DEI Policies*, Columbus Dispatch (Mar. 19, 2025), https://perma.cc/XL2E-V8UL; Laura A. Bischoff, *Ohio AG Dave Yost Wants State Teachers' Pension Fund to Sue Target Over DEI Policies*, Columbus Dispatch (Mar. 14, 2025), https://perma.cc/Y73U-442N; Dave Yost (@DaveYostOH), X (Mar. 15, 2025), https://perma.cc/P4T2-45JM.

[5] *United Nations-Supported Principles for Responsible Investment (PRI) Partners with G&E to Provide the Industry with Standardized Legal ESG Clauses*, G&E, https://perma.cc/NC57-GUBX (visited Mar. 21, 2025).

commitment to responsible investment"—*i.e.*, ESG.[6] Moreover, one of the G&E lawyers seeking to represent the class *in this case*—Caitlin Moyna—is the Co-Director of the ESG Institute and has urged the Supreme Court to recognize liability for certain ESG failures because "voluntary compliance" is not enough.[7] OSTRS's counsel is thus unable to adequately represent the class because their business interests in promoting and defending ESG investing, and their own "unwavering commitment" to ESG, conflicts with the class's interest in zealous advocacy to the contrary in this case.

OSTRS's exaggerated losses can't avoid these obvious inadequacies, and even those losses must be taken with a grain of salt. OSTRS uses a class period that absurdly extends to November 2024, *eighteen months* after the 2023 Pride Campaign. Moreover, 94 percent of OSTRS's reported losses—roughly $3.3 million—exist only on paper. OSTRS still holds those shares, presumably because it believes it can sell them at a profit later. OSTRS's financial interest is thus much weaker than it first appears.

Meanwhile, there is no question that SBA would vigorously represent the class. By any view of the financial data, SBA has a significant financial interest at stake. It jumped into the fray with its own class-action complaint—and without hesitation—months ago. And it selected counsel who have been litigating these issues for almost two years in *Craig v. Target*, No. 2:23-cv-00599 (M.D. Fla.), which has been consolidated here, and who have already defeated Target's motion to dismiss that case.

---

[6] *The Grant & Eisenhofer ESG Institute*, G&E, https://perma.cc/PC3S-3D7U (visited Mar. 21, 2025)
[7] Br. of *Amicus Curiae* Grant & Eisenhofer ESG Institute at 17, *Nestlé USA, Inc. v. John Doe I*, No. 19-416 (U.S.), https://tinyurl.com/58zt3myy.

The Court should deny the motion to appoint OSTRS as lead plaintiff and G&E as lead counsel.

## ARGUMENT

### I.    OSTRS SHOULD NOT BE APPOINTED LEAD PLAINTIFF

This Court should not appoint OSTRS as lead plaintiff because it would be an inadequate class representative. OSTRS wanted nothing to do with this case for ideological reasons that conflict with the underlying claims. It then selected counsel whose pervasive ESG work also conflicts with the arguments and interests of the class. And OSTRS's reported financial interest was inflated by mistaken methodologies.

### A. OSTRS Would Be An Inadequate Lead Plaintiff

OSTRS has given ample reason to doubt that it will "adequately protect the interests of the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa). Adequacy turns on "the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the … class" and "whether plaintiffs have interests antagonistic to those of the rest of the class." *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1254 (11th Cir. 2003). The court must assess: "(1) whether the named plaintiff and counsel have any conflicts of interest with other class members and (2) whether the named plaintiff and counsel will prosecute the action vigorously on behalf of the class." *Lapointe v. Bank of Am., N.A.*, No. 8:15-CV-1402-T-26EAJ, 2016 WL 8729824, at *3 (M.D. Fla. Apr. 26, 2016) (quotation marks omitted).

***Reluctance to Sue.*** Courts consider "the willingness of the class representative to

participate in the action." *In re Ins. Mgmt. Sols. Grp., Inc. Sec. Litig.*, 206 F.R.D. 514, 517 (M.D. Fla. 2002). Plaintiff-class representatives "should be viewed suspiciously" when they were reluctant to sue in the first place. 7A Wright & Miller, *Federal Practice & Procedure* § 1768 (4th ed., 2025 update). "When this issue arises the court must determine whether the individual's lack of desire to act as a representative reflects antagonism to the suit being brought so that the class's interests would not be adequately protected." *Id.*

OSTRS overtly resisted involvement in this suit. It initially "declined to join the lawsuit" because it considered its losses too small and its board members "either agree with Target's stated DEI, ESG and LGBTQ+ initiatives and/or do not believe that such initiatives should be actionable."[8] This "unwillingness" reflected their "position toward the underlying facts supporting the lawsuit."[9] It was Ohio's Attorney General who "want[ed] the teachers' public pension fund to sue Target,"[10] and publicly chastised OSTRS on social media to browbeat it into suing.[11] Only "[a]fter pressure from Ohio Attorney General Dave Yost," the *Columbus Dispatch* reported, did OSTRS grudgingly join the lawsuit at the last minute.[12]

---

[8] Letter from Dave Yost, *supra* note 2.

[9] *Id.*; *see* Bischoff, *Ohio AG Dave Yost Wants State Teachers' Pension Fund to Sue*, *supra* note 4; *see also* Patty Coller, *State Leaders Fire Back at AG Yost over Target Lawsuit*, WKBN Youngstown (Mar. 17, 2025), https://tinyurl.com/y3mz5kas (quoting OSTRS Executive Director saying that OSTRS had determined "that seeking lead plaintiff status in this matter would not be a prudent use of system resources at this time").

[10] *Id.*

[11] Dave Yost (@DaveYostOH), X, *supra* note 4.

[12] Bischoff, *Ohio Teachers' Pension Fund to Join Lawsuit Against Target Over DEI Policies*, *supra* note 4.

OSTRS's resistance is unsurprising and aligns with its broader support for ESG. For example, OSTRS has publicly committed for over a decade that, when voting proxies, it "will vote for resolutions requiring a company to follow the Ceres Principles."[13] The Ceres Principles are a "code of corporate environmental conduct," which include a "commitment" to selecting board members in part based on "demonstrated environmental commitment."[14] Those principles reflect the belief that "sustainability is the bottom line."[15]

OSTRS's clear "lack of desire," and even "antagonism to the suit being brought," are red flags that this Court should not ignore. 7A Wright & Miller, *supra*, § 1768. OSTRS's support for ESG and DEI practices—including those at issue here—are "a conflict that goes to the very subject matter of the litigation" and "defeat a party's claim of representative status." *Id.* The class is entitled to a representative who will vigorously defend its interests and show commitment to the case. As an unwilling participant, OSTRS is unlikely to do so.

OSTRS's deficiencies are even more stark when compared to SBA, which proactively filed its own class action complaint months ago. And SBA firmly rejects ESG factors in proxy voting, instead focusing on maximizing financial returns for investors. When exercising shareholder rights, under SBA policy "only pecuniary

---

[13] OSTRS, *Stock Proxy Voting Policy* 14 (Mar. 21, 2024), https://pdflink.to/32bc64b3/.

[14] *Id.* at 35–36; *see also* OSTRS, *Stock Proxy Voting Policy* 10, 38–39 (Mar. 12, 2012), https://perma.cc/C2YX-LR6F (same). Unsurprisingly, Target joined the Ceres Company Network to advance "goals around [its] sustainable business practices." *Target, U.S. Bank Join Ceres Company Network,* Ceres (Aug. 31, 2017) (quoting Brian Cornell), https://tinyurl.com/tmj52755.

[15] *About Us*, Ceres, https://perma.cc/Q74P-3JDV (visited Apr. 15, 2025).

factors may be considered" and "proxies should be … executed in the best interest of beneficiaries and not for the furtherance of any social, political or ideological interests."[16]

*Conflicted Class Counsel.* After being coerced into joining this suit, OSTRS hired counsel that promotes and pursues an agenda that conflicts with the claims in this case, further undermining its adequacy for class representation. A class representative must show that its counsel is "willing and able to vigorously prosecute the action." 7A Wright & Miller, *supra*, § 1769.1. The counsel must demonstrate "commitment" to the case and lack any conflict of interest. 7A Wright & Miller, *supra*, § 1769.1; *see Piambino v. Bailey*, 757 F.2d 1112, 1145–46 (11th Cir. 1985).

Courts doubt the adequacy of class counsel when their other work conflicts with the arguments of the class. For instance, when the "core allegation" in a class complaint was false advertising, that class could not be adequately represented by a lawyer who would "be forced to explain why" he "allowed a similar advertising scheme" in an earlier case. *Cochoit v. Schiff Nutrition Int'l, Inc.*, 326 F.R.D. 631, 636 (C.D. Cal. 2018). His past work created "a substantial risk" that he would hesitate to make the "strongest legal and factual arguments" for the class. *Id.* Likewise, "ideologically motivated attorneys" from the National Right to Work Committee could not adequately represent a class of union members because they lacked "undivided loyalty" to the class's interests. *Scheffer v. Civil Serv. Emps. Ass'n, Loc. 828*,

---

[16] SBA, *Corporate Governance Principles & Proxy Voting Guidelines* 1, 4–5 (2023), https://perma.cc/674V-A6PY?type=standard.

No. 05-CV-6700, 2006 WL 7066914, at *2–3, *5–6 (W.D.N.Y. Oct. 24, 2006). After opposing labor unions in litigation and policy advocacy for years, the court was "unconvinced" that the lawyers could vigorously pursue the best interests of the class. *Id.* at *6; *see also Gilpin v. AFSCME*, 875 F.2d 1310, 1313 (7th Cir. 1989) (similar); *Kidwell v. Transp. Commc'ns Int'l Union*, 946 F.2d 283, 305–06 (4th Cir. 1991) (similar).

The past work and ongoing commitments of G&E raise substantial doubts that it will vigorously pursue the class's claims against Target. G&E launched an ESG Institute that "harnesses its members' legal skills to pursue significant ESG goals."[17] As part of that mission, the ESG Institute is "committed to goals that fall within the 'S' and 'G' realms within the ESG umbrella,"[18] such as "Gender and Racial Diversity."[19] Across its work, it encourages investors and companies to prioritize ESG goals, even at the expense of financial considerations. The lead counsel for OSTRS, Caitlin Moyna, is Co-Director of the ESG Institute.

G&E's focus on ESG goals is clear in its advocacy. G&E drafted sample clauses for investment-management agreements that "state clearly the importance of

---

[17] *About Grant & Eisenhofer*, G&E, https://perma.cc/AT84-QZE7 (visited Mar. 21, 2025).

[18] The Grant & Eisenhofer ESG Institute, Comment on: Securities & Exchange Commission File No. S7-10-22, The Enhancement and Standardization of Climate-Related Disclosures for Investors (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132087-302568.pdf.

[19] *ESG-Related Cases*, G&E, https://perma.cc/4TPW-Q8BE (visited Mar. 21, 2025). Given these priorities, it is perhaps unsurprising that public reports have recently noted that 100% of national-level political donations from G&E lawyers in 2024 went to Democrats, as well as 99% of their donations since 2017. All. for Consumers, *Shady Trial Lawyer Update: The Shady Eight 2025 Update* 4 (Apr. 2025), https://perma.cc/Z74B-CUR4; *see also* Peter Pinedo, *Exclusive: 'Shady Trial Lawyer Pipeline' Funneling Millions to Democrats, According to Report*, Fox News (Apr. 2, 2025), https://perma.cc/4T2V-UVHL.

environmental, social, and governance ('ESG') considerations"[20] and incorporate principes reflecting how "ESG should be at the core of the relationship between the asset owner and the investment manager."[21] The same guide implores investors to "incorporate ESG issues into investment analysis and decision-making processes."[22] G&E makes clear that this includes pushing ESG even when *irrelevant* to a strict financial analysis. In a presentation featured on the firm's website, a G&E lawyer argues that the material considerations for investors "should not only include financial aspects" because "environmental and social materiality are of equal importance."[23]

G&E pursues the same ESG goals in litigation. In a Supreme Court amicus brief signed by Moyna and Jay Eisenhofer, G&E's ESG Institute defended the interests of ESG-focused investors who "fund companies that elevate their environmental, social and governance policies to the level usually reserved for traditional financial metrics like revenues, profits, and shareholder returns," in part because such companies "align with their ethical and moral codes." Br. of *Amicus Curiae* Grant & Eisenhofer ESG Institute at 4, 8, *Nestlé*, *supra* note 7. G&E argued that efforts to encourage "voluntary compliance with ESG goals" have failed, making liability for "ESG transgressions" necessary to "encourage publicly-traded U.S. corporations to elevate their standards and adhere to ESG goals." *Id.* at 17, 23. And G&E feared that the lack of liability

---

[20] Principles for Responsible Inv. ("PRI"), *Investment Manager Appointment Guide* 8 (2020), https://perma.cc/WB7C-WASP.
[21] *Id.* at 4.
[22] *Id.* at 2; *see also* Int'l Corp. Governance Network ("ICGN") & Glob. Invs. for Sustainable Dev. All. ("GISD"), *Model Mandate* 10 (2022), https://perma.cc/H7A8-ARK6?type=standard.
[23] *Events & Presentations*, G&E, https://perma.cc/M9ZW-Y9PQ (visited Mar. 21, 2025).

would enable "[h]alf-hearted corporate promises to 'do better'" in achieving "environmental or social goals." *Id.* at 17.

G&E's pro-ESG work even goes international. Indeed, "G&E is actively leading cases representing institutional investors in non-U.S. jurisdictions, protecting investor's rights and effectively implementing ESG Policies."[24]

G&E's business objectives and advocacy squarely conflict with the core allegation here that Target prioritized ESG over financial returns and mislead investors about doing so. As SBA's complaint argues, Target was "subject to a specific and material risk of consumer backlash to its ESG and DEI initiatives," ECF No. 1, ¶ 275, yet Target told shareholders "that the only risks stemming from Target's ESG/DEI mandates came from Target failing to adequately 'achieve' such mandates," *id.* ¶ 285; *see also id.* ¶¶ 92–108. And Target did so, SBA's complaint asserts, because of its commitment to appeasing "a discrete and ascertainable group of nonprofit stakeholder activists and organizations" that promote ESG policies. *Id.* ¶ 344; *see also id.* ¶¶ 66–184.

Its pervasive advocacy indicates that G&E might actually applaud Target's commitment to those goals. After all, "ESG goals" are so important to G&E's ESG Institute that it thinks that companies should be held *liable* for certain "ESG transgressions" and failures to meet "environmental or social goals." Br. of *Amicus Curiae* Grant & Eisenhofer ESG Institute at 17, 23, *Nestlé*, *supra* note 7. And G&E

---

[24] PRI, *supra* note 20, at 5.

lawyers say that meeting those ESG goals is at least of "equal importance" to delivering financial results.[25] According to the G&E ESG Institute, Target may have been *right* to assume that the most important risk would be *failing* to meet ESG goals and to report to shareholders accordingly.

To be clear, the issue is not that G&E has vigorously represented clients that support ESG. Nor is the issue competence, because G&E's team is made up of highly competent lawyers who routinely litigate in this space. This case is unique because G&E is so intimately and pervasively aligned with a certain ideology that conflicts with the claims in this not-so-routine case. G&E's attorneys, if they represent this class, may "be forced to explain why" Target's actions were different than the business practices they actively promote. *Cochoit*, 326 F.R.D. at 636. At minimum, G&E's longstanding pro-ESG stance calls into question whether its attorneys will vigorously make the "strongest legal and factual arguments" against Target's conduct. *Id.* Given the ideological and conflict-laden motivations of G&E here, it will not be able to show "undivided loyalty" to this class. *Scheffer*, 2006 WL 7066914, at *5–6.

G&E's involvement also raises ethical concerns. Under Florida's Rules of Professional Conduct,[26] "a lawyer must not represent a client" if "there is a substantial risk that the representation of 1 or more clients will be materially limited" by "a personal interest of the lawyer." R. Regul. Fla. Bar 4-1.7(a). Such a conflict may be

---

[25] *Events & Presentations*, *supra* note 23.
[26] Florida's Rules of Professional Conduct apply to all attorneys appearing in this case under Local Rule 2.01(e).

waived only if "each affected client gives informed consent, confirmed in writing or

clearly stated on the record at a hearing." *Id.* 4-1.7(b)(4).

G&E has a vested interest in corporate ESG. Even beyond the ESG Institute's

advocacy, G&E boasts that it has secured billions of dollars in settlements in cases that

"directly address ESG criteria" because the respective companies failed to stop an

environmental or social harm.[27] And G&E has solicited business by promoting ESG,

DEI, and LGBT messaging in public-facing content on its website and social media

accounts. The firm maintains blogs that highlight changes in the legal landscape on

ESG, DEI, and LGBT issues[28]—all while soliciting business from those interested in

"furthering" the related "mission" of ESG through legal action.[29]

Understandably, some members of the class are concerned that G&E's interest

in supporting and promoting ESG activism will conflict with the class's interest in

holding Target accountable for the type of activities the firm has supported and

profited from. *See* Craig Decl., Ex. B, at ¶¶ 10–11 (withholding consent from the firm's

---

[27] *ESG-Related Cases*, *supra* note 19.

[28] *See The Grant & Eisenhofer ESG Institute*, *supra* note 6; *Home*, Fighting for Civil Rts., https://perma.cc/BR32-CBHS (visited Apr. 15, 2025).

[29] *ICGN & GISD Partner with Grant & Eisenhofer ESG Institute to Standardize Legal ESG Draft Clauses for Updated Model Mandate*, G&E, https://perma.cc/CD84-GZZ3 (visited Apr. 2, 2025); *see Hedge Funds Making Progress, But Slow to Adopt ESG*, G&E, https://perma.cc/8Z5K-62LL (visited Apr. 2, 2025); G&E, *Transgender Discrimination Claim Moves Forward, Prompting Employers to Review Policies*, Fighting for Civil Rts. (Dec. 3, 2021), https://perma.cc/2WAU-A39H; G&E, *U.S. Dep't of Education Memorandum Protects LGBTQ Rights*, Fighting for Civil Rts. (July 6, 2021), https://perma.cc/SDR5-ZTFL; Grant & Eisenhofer P.A. (@gelaw_com), X (Nov. 24, 2023), https://perma.cc/P4EC-CXJL; Grant & Eisenhofer P.A. (@gelaw_com), X (Nov. 20, 2023), https://perma.cc/PN4H-E4ET; Grant & Eisenhofer P.A. (@gelaw_com), X (June 10, 2022), https://perma.cc/3DMF-YHG4.

representation of him). At the very least, such a potential conflict should give the Court pause in considering whether the firm will adequately represent the class's interests.

SBA's counsel has none of these conflicts. They instigated the litigation of these issues and have been developing the case for nearly two years at significant expense of time and resources, and already defeated Target's motion to dismiss in *Craig*.

## B. OSTRS's Loss Calculations Are Inflated

OSTRS's financial estimates are also highly misleading and cannot cure its inadequacy as lead plaintiff. Specifically, OSTRS relies on an implausible class period and claims largely unrealized losses.

*Class Period.* At the lead plaintiff stage, courts must review "the factual allegations as pled" in the complaint to assess whether a proposed class period is "not plausible," *In re Centerline Holding Co. Sec. Litig.*, No. 08 Civ. 505 et al., 2008 WL 1959799, at *3 (S.D.N.Y. May 5, 2008) (emphasis omitted), or "frivolous," *Plumbers & Pipefitters Loc. 562 Pension Fund v. MGIC Inv. Corp.*, 256 F.R.D. 620, 625 (E.D. Wis. 2009). Otherwise, "potential lead plaintiffs would be encouraged to manipulate the class period so they had the largest financial interest." *In re BP, PLC Sec. Litig.*, 758 F. Supp. 2d 428, 434 (S.D. Tex. 2010).

OSTRS reported its losses under only one class period: March 9, 2022—November 19, 2024, referred to as the "combined period" in SBA's Motion for Appointment as Lead Plaintiff. *Compare* ECF No. 57-2 at 1 (OSTRS loss chart), *with*

ECF No. 56 at 6 (SBA loss chart).[30] But "based on the factual allegations … this is
not [a] *plausible*" class period. *In re Centerline Holding Co.*, 2008 WL 1959799, at *3.

As all complaints make clear, Target's fraud was fully revealed to the market
long before November 19, 2024. The 2023 Pride Campaign began in May 2023,
exposing the fraud and causing the stock drop. ECF No. 1, ¶¶ 7, 29, 205–44; Am.
Compl. ¶¶ 6, 28, 207–46, *Craig v. Target Corp.*, No. 2:23-cv-00599 (M.D. Fla.) ("*Craig*
Compl."). The complaints also allege that an August 16, 2023, earnings report call
disclosed additional fraud by showing that Target CEO Brian Cornell's May 2023
statement, where he claimed that Pride-themed merchandise was relocated in stores
for employee safety reasons, was false. ECF No. 1, ¶¶ 236–38, 260–66; *Craig* Compl.
¶¶ 247–68. SBA's proposed class period tracks this timeline, beginning after the first
alleged misrepresentation on March 9, 2022, and ending with the August 16, 2023,
call. ECF No. 1 ¶¶ 396–402, 449.

OSTRS's class period, however, assumes that shareholders who purchased
Target stock eighteen months after the 2023 Pride Campaign (and fifteen months after
the August 16, 2023, call) were still purchasing shares that were inflated by Target's
misstatements in 2022 and early 2023. That makes no sense. Indeed, the fraud was
clear enough that the investors in *Craig* filed their lawsuit on August 8, 2023. They
amended their complaint in November 2023 to add allegations concerning the August

---

[30] Although SBA's class complaint alleged a different class period than the *City of Riviera Beach Police Pension Fund v. Target Corp.*, No. 2:25-cv-85 (M.D. Fla.), complaint, there was no need for an additional notice to the class. *See, e.g.*, *Rauch v. Vale S.A.*, 378 F. Supp. 3d 198, 207 (E.D.N.Y. 2019); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 503 (S.D. Fla. 2003).

16, 2023, call. By November 19, 2024—the end of OSTRS's class period—this Court had already received full merits briefing in *Craig*, held oral argument, and presumably started preparing the opinion that would issue two weeks later. Shareholders purchasing Target stock at that time were not being misled by the 2022 and early 2023 statements challenged by these related cases.

The only explanation offered by G&E in the *Riviera Beach* complaint is that a report released on November 20, 2024, showed that Target's earnings for the previous quarter were disappointing. ECF No. 1, ¶¶ 129–30, *City of Riviera Beach Police Pension Fund v. Target Corp.*, No. 2:25-cv-85 (M.D. Fla.). But more bad news about Target in November 2024 does not show that the market price then was still inflated by fraudulent statements made in 2022 and early 2023 and exposed as false in May and August 2023. As Dr. Bhattacharya explains, nothing indicates that the November 20 report came as a surprise to the market or corrected any misleading information. *See* Bhattacharya Decl., Ex. A, ¶ 9.

*Unrealized Losses*. Further, almost all OSTRS's claimed losses ($3.3 million of $3.5 million) come from shares purchased during the class period that were held and never sold. ECF No. 57-2 at 1.[31] To calculate the losses for shares never sold, OSTRS proceeds as if they were sold for the average price of Target stock over the 90-days that follow the end of the class period, *i.e.*, "90-day look back." ECF No. 57-2 at 1, 3.

---

[31] During the class period in SBA's complaint—March 9, 2022, to August 16, 2023—SBA has determined that its loss estimate includes $23,769.98 of unrealized losses. Its realized losses for that class period are thus $267,465.68. *See* ECF No. 56-1 at 3.

In deciding which potential lead plaintiff has the "largest financial interest in the relief sought by the class," 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb), it is an open question whether to consider unrealized losses from shares purchased during the class period but never sold. The PSLRA requires that "*damages*" should include unrealized losses using a 90-day look back. *Id.* § 78u-4(e)(1) (emphasis added). But that says nothing about whether the same rule applies in determining *losses* at the lead-plaintiff stage. While "some courts do apply this calculation method in ascertaining financial interest at the lead plaintiff stage," "others have held [it] has no relevance to that inquiry." 7 Newberg & Rubenstein on Class Actions § 22:57 (6th ed., 2024 update) (collecting cases); *see id.* § 22:42.

The best reading of the statutory text is that unrealized losses are irrelevant at the lead-plaintiff stage. The 90-day look back provision, which provides a method for calculating unrealized changes in value, is limited by the text to "damages." 15 U.S.C. § 78u-4(e)(1). And "[d]amages" is "a term of art and a technical matter to be established by experts." *In re Ribozyme Pharms., Inc. Sec. Litig.*, 192 F.R.D. 656, 661 (D. Colo. 2000). "Damages" evokes an ultimate assessment of what the legal rules will provide at the end of the day. Conversely, the "lead plaintiff provision in the PSLRA does not use the term 'damages' but instead, 'largest financial interest.'" *In re Ribozyme Pharms.*, 192 F.R.D. at 661.

Those textual distinctions compel the conclusion that a lead plaintiff's financial interest is calculated differently than damages. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it

15

is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). Congress could have directed courts to choose the lead plaintiff based on expected damages, but intentionally chose a different concept—largest financial interest.

With this textual change, Congress ensured that the lead-plaintiff process would turn on a simplified, back-of-the-envelope calculation. "The PSLRA contemplates a quick selection of a lead plaintiff near the outset of a case, without opportunity for discovery on likely damages or losses." *In re WatchGuard Sec. Litig.*, No. C05-678JLR, 2005 WL 8188936, at *4 (W.D. Wash. July 13, 2005). Accordingly, multiple courts have concluded that selecting a lead plaintiff should not weigh unrealized losses, as including them would require applying the 90-day look back and its "complicated methodology—that will necessar[il]y apply at the end of the case—at its outset." 7 Newberg & Rubenstein, *supra*, § 22:57; *see, e.g.*, *Mariconda v. Farmland Partners Inc.*, No. 18-CV-02104, 2018 WL 6307868, at *3–4 (D. Colo. Dec. 3, 2018); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 396 n.5 (S.D.N.Y. 2008); *In re Ribozyme Pharms.*, 192 F.R.D. at 661–62. As Dr. Bhattacharya explains, "a realized loss is substantially more reliable than a paper loss." Bhattacharya Decl., Ex. A, ¶ 7. And an investor may decline to sell damaged shares to realize a loss, believing the security will rebound. *Id.* ¶ 8.

Moreover, excluding unrealized losses makes practical sense. Damages is "a technical matter to be established by experts." *In re Ribozyme Pharms.*, 192 F.R.D. at 661. Indeed, in the typical securities class action, damages turn on complicated

regression analyses that tease out the harm caused by the fraud from industry-wide
trends and other confounding variables. Lead-plaintiff contests cannot turn on such
complicated analyses, given the short time frame and underdeveloped factual record.

In any event, even if the court considers unrealized losses, it should still note
that OSTRS is unusually dependent on such losses, making its financial interest
weaker than it first appears. Under OSTRS's preferred "combined" class period, 94
percent of OSTRS's losses come from unrealized losses. *See* ECF No. 57-2 at 1.
OSTRS losses are overwhelmingly only on paper.

*    *    *

OSTRS's reluctance to sue Target and selection of conflicted class counsel show
that OSTRS will not vigorously represent the class. And its financial interest is weaker
than its initial report indicated. OSTRS should not be appointed as the lead plaintiff.

## II.   ALTERNATIVELY, THIS COURT SHOULD REJECT OSTRS'S SELECTION OF COUNSEL

The PSLRA makes the lead plaintiff's selection of counsel "subject to the
approval of the court." 15 U.S.C. § 78u-4(a)(3)(B)(v). Thus, "the lead plaintiff's right
to select and retain counsel is not absolute." *In re Cendant Corp. Litig.*, 264 F.3d 201,
273 (3d Cir. 2001). "[A]pproval of lead counsel necessarily requires an independent
evaluation of, among other considerations, the effectiveness of proposed class counsel
to ensure the protection of the class." *In re Molson Coors Brewing Co. Sec. Litig.*, 233
F.R.D. 147, 151 (D. Del. 2005); *see also In re Lucent Techs., Inc., Sec. Litig.*, 221 F. Supp.
2d 472, 488–89 (D.N.J. 2000). "The court has an obligation to assure that Lead

17

Plaintiff's choice of representation best suits the needs of the class." *Johnson v. Pozen Inc.*, No. 1:07CV599, 2008 WL 474334, at *3 (M.D.N.C. Feb. 15, 2008).

Even if this Court appoints OSTRS as lead plaintiff, it should reject OSTRS's selection of lead counsel. For the reasons discussed above, replacing G&E is "necessary to protect the interests of the class." *In re Jan. 2021 Short Squeeze Trading Litig.*, No. 21-2989, 2021 WL 4840857, at *6 (S.D. Fla. Oct. 15, 2022) (cleaned up). The class is entitled to counsel who can make unreserved arguments that Target's elevation of ESG goals above shareholders was wrong and its failure to adequately disclose ESG-focused decisionmaking violated the securities laws. G&E cannot effectively do so given its record advocating across the world for Target's approach.

If the Court appoints OSTRS as lead plaintiff, the Court should instead appoint Boyden Gray PLLC, the Attorney General of Florida, Lawson Huck Gonzalez, and America First Legal Foundation as "interim" lead counsel. *See* Fed. R. Civ. P. 23(g)(3); *Lamontagne v. Tesla, Inc.*, No. 23-cv-00869, 2023 WL 4353146, at *3 & n.3 (N.D. Cal. July 5, 2023). This makes sense when, as here, "multiple lawyers have filed duplicative purported class actions and seek to represent the same or similar proposed classes." 1 McLaughlin on Class Actions § 4:38 (21st ed., 2024 update). And it ensures someone will "protect the interests of the putative class during pre-certification proceedings, discovery, including retaining experts, and any settlement discussions." *Id.*; *see In re Data Breach Sec. Litig. Against Caesars Ent., Inc.*, No. 2:23-cv-1447, 2024 WL 2959279, at *1 (D. Nev. June 12, 2024).

18

Boyden Gray PLLC has previously represented the State of Ohio—including OSTRS specifically—in other cases (including securities litigation), ensuring a productive relationship while serving as "interim" lead counsel until permanent counsel is approved. *See, e.g.*, *Ohio Pub. Emps. Ret. Sys. v. Discovery, Inc.*, No. 24-646 (2d Cir.); *Ohio v. U.S. Dep't of Homeland Sec.*, No. 3:24-cv-00283 (S.D. Ohio).

## CONCLUSION

For the foregoing reasons, SBA respectfully requests that this Court appoint SBA as lead plaintiff pursuant to the PSLRA and approve the SBA's selections of counsel. In the alternative, SBA requests that the Court reject OSTRS's selection of G&E as class counsel and appoint SBA's selections of counsel as interim counsel.

Dated: August 7, 2025                              Respectfully submitted,

---

JAMES UTHMEIER (FBN: 113156)
Attorney General
State of Florida
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-330




JASON B. GONZALEZ (FBN: 146854)
PAUL C. HUCK, JR. (FBN: 968358)
SAMUEL J. SALARIO, JR. (FBN: 083460)
Lawson Huck Gonzalez, PLLC
215 S. Monroe Street, Suite 320
Tallahassee, FL 32301
(850) 825-4334
jason@lawsonhuckgonzalez.com

/s/ R. Trent McCotter
R. TRENT MCCOTTER (*pro hac vice*)
  LEAD COUNSEL
Boyden Gray PLLC
800 Connecticut Avenue NW
Suite 900
Washington, DC 20006
(202) 706-5488
tmccotter@boydengray.com


ANDREW J. BLOCK (*pro hac vice*)
America First Legal Foundation
611 Pennsylvania Avenue S.E.
No. 231
Washington, D.C. 20003
(202) 964-3721
andrew.block@aflegal.org

---

*Counsel for Movant*

---

20

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 7, 2025, I electronically filed the
foregoing with the Clerk of the Court by using the CM/ECF system, which will
provide service to all parties who have registered with CM/ECF and filed an
appearance in this action.

/s/ R. Trent McCotter
R. Trent McCotter (*pro hac vice*)
Boyden Gray PLLC
800 Connecticut Avenue NW
Suite 900
Washington, DC 20006
(202) 706-5488
tmccotter@boydengray.com